[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-11432

_____

In re: VIRTUAL CITADEL, INC., et al.,

                                Debtor.

_____

BAY POINT CAPITAL PARTNERS II, LP,

                                Plaintiff-Appellant,

versus

THOMAS SWITCH HOLDING, LLC,

                                Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cv-00074-SEG

_____

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

This appeal requires us to decide whether a bankruptcy court erred in valuing a bitcoin mining property. In so doing, we must answer three questions: First, did the bankruptcy court clearly err in finding that the property was a special purpose property with mining bitcoin as its highest and best use? Second, considering those findings, did the bankruptcy court choose the incorrect method to value the property as a matter of law? And third, did the bankruptcy court clearly err in giving the tax stamp value of the property some weight in its valuation? We answer "no" to each of those questions. Accordingly, we affirm.

### I.

#### A.

Michael Oken owned and operated two related businesses in College Park and Atlanta, Georgia. The businesses were located on two adjacent properties, one that housed a bitcoin mining operation and the other that housed a data storage center. The bitcoin mining operation is at issue in this appeal. Oken bought the nearly one-acre mining property for $50,000 and invested millions in infrastructure upgrades to mine bitcoin on the property.

Bitcoin mining requires enormous amounts of power. So, important to the operation was a Power Sales Agreement Oken entered with the City of College Park, Georgia, to receive fifteen megawatts of low-cost power for five years at the mining property. That agreement resulted in electrical savings of up to $4 million per year. It also required Oken to pay around $885,000 for infrastructure upgrades to the property, including six transformers, to accommodate the increased electrical capacity. Although Oken paid for those improvements, the city owned the transformers and could hypothetically remove them if it chose to do so. Oken also completed around $3 million in other improvements to the property to prepare it to mine bitcoin and built a 3,000 square feet metal-sided "butler building" on the property to house electrical equipment, including "antboxes"—the containers storing the machines that do the bitcoin mining.

Oken died in 2019, which led his businesses to file for Chapter 11 bankruptcy in 2020. The bankruptcy estate sold the data center business and bitcoin mining operation together for $4.9 million. The deeds transferring the properties to the purchaser contained a stamp showing $2,450 in transfer taxes paid for each property. Because Georgia law imposes a 0.1% tax on transfers of real property, a $2,450 "tax stamp" value indicates a $2.45 million purchase price for each property.

The purchaser of the operation bought the mining property because of its existing bitcoin mining infrastructure and planned to expand and continue to use the property to mine bitcoin.

Specifically, the purchaser bought the property to "bring in as many bitcoin mining machines as they could and run a bitcoin mining operation." The purchaser negotiated a new power sales agreement with the city and continued to use the property as a bitcoin mining facility.

After the sale, two creditors sought to recover on liens on the businesses' property. Thomas Switch Holding had loaned $545,000 that was secured by a perfected first-priority lien on the mining property. Bay Point Capital loaned money to the debtors after they filed for bankruptcy and held a perfected first-priority lien on all the other assets of the mining operation, including the data center property. The order approving the sale of the mining operation required $700,000 of the proceeds to be put in escrow pending the determination of the amount of Switch's lien, which attached up to $700,000 of the value of the mining property. Thus, if the mining property was valued at $700,000 or higher, Switch would receive the full $700,000. If the mining property was valued at less than $700,000, Switch would receive that amount and Bay Point would receive the difference.

B.

After a bench trial, the bankruptcy court found that the value of the mining property was over $700,000 and thus Switch was due the entire amount held in escrow. In valuing the property, the bankruptcy court considered two common valuation methods—the sales comparison approach (which considers the value at sale of comparable properties) and the cost approach (which

23-11432               Opinion of the Court                         5

considers the cost to replace the property). The parties did not argue for, and the bankruptcy court did not consider the income approach, another commonly used valuation method.

At the bench trial, Switch's appraiser, Michael Easterwood, testified that the mining property's highest and best use was as a bitcoin mining operation, it was a special purpose property, and there were no comparable properties with access to fifteen megawatts of power available on the market. Thus, Easterwood opined that the cost approach was the most appropriate method to value the property and that the mining property should be valued at $830,000. He based his opinion on the value of the land at $60,000, the butler building at $100,000, and the cost of the improvements necessary to use fifteen megawatts of power on the property at $885,000. He also added engineering costs, applied discount factors, and depreciated the property. But he did not include the value of the antboxes, other equipment on the property, or any personal property. He also did not consider the $3 million Oken invested in electrical distribution improvements because he was unaware of those improvements at the time of his appraisal. And he did not consider the tax stamp value of the property.

Bay Point's appraiser, Jeff Miller, testified that the sales comparison approach was the most appropriate method to value the mining property and that the value of the mining property was $48,000. To support his conclusion, he considered the mining property being landlocked with the only road access being through the data center property. Although he could not identify any similar

properties that could be used to mine bitcoin that could be used for a comparison, he compared the property to other properties of a comparable size that could be put to "light industrial" use. He did not consider the infrastructure upgrades to bring power to the property.

The bankruptcy court largely agreed with Easterwood's testimony, adopted the cost approach to value the mining property, and held that the property was worth more than $700,000. It first concluded that, although the tax stamp value was not deserving of much weight, a tax stamp value of $2.45 million weighed in favor of a total valuation greater than $700,000. It next explained that Easterwood's calculation was the most reliable because he was the only expert to account for the property's infrastructure improvements and electrical capacity that allowed the property to be used to mine bitcoin. The bankruptcy court thus accepted Easterwood's conclusion that the highest and best use for the property was as a bitcoin mining operation and that the property was a special purpose property. The bankruptcy court also noted that the purchaser bought the property to use for bitcoin mining and used it for that purpose. Applying the cost approach, the bankruptcy court found that, given the significant upgrades to the property that would be required to recreate a comparable bitcoin mining property, the value of the mining property was over $700,000.

Bay Point appealed the bankruptcy court's decision to the district court, which rejected its arguments and affirmed the bankruptcy court. This appeal followed.

23-11432               Opinion of the Court                          7

## II.

Because the district court affirmed the bankruptcy court's order, we independently review the "factual and legal determinations of the bankruptcy court and employ the same standards of review as the district court." *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 698 (11th Cir. 2005). We review the bankruptcy court's legal conclusions *de novo* and its factual findings for clear error. *Id*. Factual findings are clearly erroneous only if we are "left with the definite and firm conviction that a mistake has been committed." *Id*. (citation and internal quotation marks omitted).

## III.

Bay Point makes three arguments against the bankruptcy court's decision to value the property at over $700,000. First, Bay Point argues that the bankruptcy court erred in determining that the property is a special purpose property with the highest and best use of bitcoin mining. We review that determination as a factual finding for clear error. Second, it argues that the bankruptcy court erred as a matter of law when it selected the cost approach, instead of the sales comparison approach, to value the mining property. *See In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1075 (11th Cir. 2015) (holding that this choice is a legal determination). Finally, Bay Point argues that the bankruptcy court clearly erred when, as part of its valuation, it considered the tax stamp value of the property. We address each argument in turn.

| 8 | Opinion of the Court | 23-11432 |

### A.

We first consider the bankruptcy court's finding that the mining property is a special purpose property with the highest and best use of mining bitcoin. A property's highest and best use is the most profitable and likely use for the property. *See TOT Prop. Holdings, LLC v. Comm'r*, 1 F.4th 1354, 1369–70 (11th Cir. 2021). A special purpose property is defined by three primary characteristics: a physical design built for a specific use or purpose; a lack of financial viability for any other use or purpose; and a lack of comparable properties on the market. *See* J.D. Eaton, Real Estate Valuation in Litigation 242 (2d Ed. 1995); *United Techs. Corp. v. Town of East Windsor*, 807 A.2d 955, 965 n.22 (Conn. 2002). *See also Johnston Coca-Cola Bottling Co. v. Hamilton Cnty. Bd. of Revision*, 73 N.E.3d 503, 508 (Ohio 2017) (defining a "special purpose" property as one that is "built for a unique purpose, is in good condition, and is being used for that purpose—both presently and for the foreseeable future").

The bankruptcy court accepted Easterwood's opinion that the highest and best use of the mining property was as a bitcoin mining operation and that this use made it a special purpose property. As to the property's highest and best use, the bankruptcy court noted that Oken had improved the property so that it could be used as a bitcoin mine, that the purchaser was interested in the property because these improvements allowed it to be used to mine bitcoin, and that the property continued to be used as a bitcoin mine after the sale. As to whether the property was a special purpose property, the bankruptcy court noted that Oken spent

around $3 million to improve the property to allow it to use fifteen megawatts of power—an infrastructure investment that would be wasted if it was used for a purpose other than bitcoin mining. The bankruptcy court also accepted Easterwood's opinion that there were no comparable properties on the market that could be used for the same purpose.

We are not "left with the definite and firm conviction" that the bankruptcy court clearly erred. *Int'l Admin. Servs.*, 408 F.3d at 698 (quoting *Lykes Bros., Inc. v. U.S. Army Corps of Eng'rs,* 64 F.3d 630, 634 (11th Cir. 1995)). In fact, many of its findings are undisputed. There is no dispute that Oken benefited from low-cost electricity rates for the property in College Park, Georgia. There is no dispute that, to use that electricity to mine bitcoin, Oken spent around $3 million on infrastructure improvements to the property. It is undisputed that the purchaser bought the property to use as a bitcoin mine and continued to use it for that purpose. And it is undisputed that there was no comparable property for sale on the market that would allow a similar use with similar access to electricity because of similar improvements.

Despite the lack of any meaningful dispute on this record, Bay Point says the bankruptcy court's factual findings are clearly erroneous. It makes three arguments in this regard, but none is persuasive.

First, Bay Point says the bankruptcy court's valuation of the property incorrectly incorporated the value of the Power Sales Agreement, which was not transferrable, and the installed

equipment that Oken paid for, but that the city continued to own. We disagree. True, the Power Sales Agreement did not run with the property, and the property could not be used to mine bitcoin without a similar agreement. Likewise, it is true that College Park retained ownership of the transformers that Oken installed on the property. But these arguments miss the point. The bankruptcy court reasoned that the property was valuable because of the infrastructure upgrades that allowed its owner to use electricity that the city was willing to sell. That reasoning was borne out by the purchaser's actions. By the time of the bankruptcy court's valuation, the purchaser had entered into its own agreement with the city to buy low-cost electricity for mining bitcoin. And there was no reason for the city to remove the transformers that Oken had paid to install.

Second, Bay Point argues that there is insufficient evidence that bitcoin mining is the highest and best use of the property because Switch introduced no evidence that bitcoin mining was profitable on the property at the time of the valuation. Again, we disagree. For starters, we note that the original business filed for bankruptcy because of Oken's death, not because the business failed. More importantly, Bay Point again ignores the fact that the purchaser bought the property to use for bitcoin mining and, in fact, continued to use it for that purpose. As our predecessor court explained, "[o]rdinarily, the highest and best use for property" is its actual use "because economic demands normally result in an owner's putting his land to the most advantageous use." *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962). Even in the

absence of evidence about the profitability of bitcoin mining, we cannot say the bankruptcy court committed clear error in finding that the property could feasibly be used for bitcoin mining when it had been used that way in the past and was continuing to be used for that purpose at the time of the valuation.

Third, Bay Point argues the bankruptcy court erred in designating the property a special purpose property because the improvements to the property do not *prevent* it from being used for purposes other than bitcoin mining. Again, we disagree. The question in assessing whether a property is a special purpose property is whether there is another viable use in light of the capital invested in the property. Of course, with enough additional investment or a willingness to forego money already invested, this property could be used for some other industrial purpose. But valuing the property as a general one-acre "light industrial" property would put to waste all of Oken's investments to allow bitcoin mining. And, yet again, Bay Point would ignore the fact that the purchaser bought the property to mine bitcoin and used it for that purpose.

For these reasons, the bankruptcy court did not clearly err in classifying the property as a special purpose property with the highest and best use as a bitcoin mine.

*B.*

In light of these findings, we next ask whether the bankruptcy court correctly selected the cost approach to value the mining property. We conclude it did. The bankruptcy code provides that a property valuation should be made "in light of the purpose

of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on [that] disposition or use." 11 U.S.C. § 506(a)(1). Rather than command a specific method to value collateral, the bankruptcy code "gives a bankruptcy court flexibility in choosing among the possible standards of valuation to fit the particular circumstances of each case." 8B C.J.S. Bankruptcy § 977.

There are three commonly used valuation methods bankruptcy courts use to value property: the sales comparison approach, the cost approach, and the income approach. *See, e.g.*, *In re Mocco*, 222 B.R. 440, 457 (Bankr. D.N.J. 1998). The sales comparison approach values a property using data from recent sales of comparable properties in the market. *See. e.g.*, *In re 150 N. St. Assocs.*, 184 B.R. 1, 6 (Bankr. D. Mass. 1995). This approach "is disfavored for unique assets for which recent comparable sales are limited or do not exist." *In re Motors Liquidation Co.*, 576 B.R. 325, 427 (Bankr. S.D.N.Y. 2017). The cost approach, on the other hand, is used to value "special-purpose properties, and other properties that are not frequently exchanged in the market." *Waranch v. Comm'r*, 58 T.C.M. (CCH) 584 (1989). It considers "the cost to build a replacement, minus accrued depreciation, or the cost to purchase an existing structure and make any necessary modifications." *Id*. And it is most appropriate when "comparable sales are not available." *Id*. Finally, the income approach values a property by capitalizing the anticipated future income from owning the property. *See, e.g., In re Cool*, 81 B.R. 614, 618 (Bankr. D. Mont. 1987).

23-11432               Opinion of the Court                    13

In light of the bankruptcy court's determination that the mining property is a special purpose property with the highest and best use of bitcoin mining, we think the bankruptcy court correctly selected the cost approach. Bay Point argues the bankruptcy court should have selected the sales comparison approach instead of the cost approach. But no expert identified a comparable property *that could be used to mine bitcoin*. And neither party argues the income approach is a proper way to value the property. In bankruptcy, "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question." *Assocs. Com. Corp. v. Rash*, 520 U.S. 953, 962 (1997) (quoting 11 U.S.C. § 506(a)(1)). The cost approach was the only approach that allowed the bankruptcy court to give some weight to the improvements that allowed the property to handle the electricity needed for bitcoin mining.

C.

Finally, Bay Point argues the bankruptcy court clearly erred by considering the tax stamp as additional evidence that the value of the property was greater than $700,000. The bankruptcy court noted that the transfer tax stamp value of $2,450 for the mining property reflected a value of $2.45 million. But the bankruptcy court also recognized that this value was likely attributed to the property out of convenience—i.e., it is half the total sales price. Nonetheless, the bankruptcy court reasoned that, even if the tax stamp value were set mostly out of convenience, it suggested that the property was worth at least $700,000 because "it is hard to

rationalize a decision to indicate a purchase price over 3.5 times the real value."

We cannot say the bankruptcy court clearly erred in how it weighed this piece of evidence. First, it was reasonable for the bankruptcy court to give *some* weight to the property's tax stamp value. Indeed, "all relevant factors to property value must be considered to arrive at a just valuation of a property," and the assigned value of a property for tax purposes is at least one of the factors that a court may consider. *In re Seaside*, 780 F.3d at 1075 (quoting *In re Webb MTN, LLC,* 420 B.R. 418, 435 (Bankr. E.D. Tenn. 2009)). Second, the bankruptcy court did not assign the tax stamp an unreasonable or inordinate weight. The bankruptcy court made clear that the tax stamp value of $2.45 million supported, but did not compel, the proposition that the property was worth more than $700,000.

★      ★      ★

We cannot say the bankruptcy court erred. The record supports the bankruptcy court's determination that the mining property was worth more than $700,000. And Bay Point has not established that the bankruptcy court committed an error of law or fact in its assessment of the property's value.

## IV.

We **AFFIRM** the judgment of the lower courts.